DECISION
{¶ 1} In this original action, relator, Scott M. Heffernan, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation, and to enter an order granting said compensation. In the alternative, relator requests a writ of mandamus *Page 2 
ordering the commission to vacate its order denying him R.C. 4123.56
wage loss compensation, and to enter an order granting said compensation.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision (attached as Appendix A), including findings of fact and conclusions of law. Therein, the magistrate concluded (1) that relator cannot show eligibility for TTD compensation during the hockey off-seasons; (2) the commission did not abuse its discretion in denying wage loss compensation; and (3) the commission did abuse its discretion in determining that the industrial injury has become permanent and that the medical evidence itself is insufficient to support TTD compensation. Therefore, the magistrate recommended that this court issue a writ of mandamus ordering the commission to vacate its order to the extent that it determines that the industrial injury has become permanent and that the medical evidence itself is insufficient to support TTD compensation.
 {¶ 3} Both the relator and the commission filed objections to the magistrate's decision. Relator objects to the magistrate's conclusion that relator cannot show eligibility for TTD compensation during the hockey off-seasons for various time periods. Relator's objections, however, essentially contain a reargument of that already submitted to and addressed by the magistrate. For the reasons set forth in the magistrate's decision, we do not find relator's position to be well-taken. Consequently, relator's objections are overruled.
 {¶ 4} The commission contends the magistrate needlessly found the commission abused its discretion because the issue of permanency was a secondary finding by the *Page 3 
commission and has no bearing on relator's entitlement to TTD compensation for the time periods at issue in this case. The commission further contends that relator did not ask for the relief the magistrate recommends, and that the concerns of the magistrate in this instance are purely hypothetical. Upon review, and for the reasons set forth in the magistrate's decision, we do not find the commission's position to be well-taken. Accordingly, we overrule the commission's objection to the magistrate's decision.
 {¶ 5} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, the commission's and relator's objections to the magistrate's decision are overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we issue a writ of mandamus ordering the commission to vacate its staff hearing officer's order of March 1, 2005, to the extent that it denies TTD compensation on grounds that the industrial injury has become permanent or has reached maximum medical improvement and to the extent that it finds the medical evidence itself to be insufficient and to enter an amended order that denies TTD compensation solely on grounds that relator was ineligible to receive said compensation during the hockey off-seasons in the absence of evidence that he intended to obtain other employment.
Objections overruled; writ of mandamus issued.
 SADLER, P.J., and TYACK, J., concur. *Page 4 
 APPENDIX A MAGISTRATE'S DECISION Rendered on July 20, 2007 IN MANDAMUS {¶ 6} In this original action, relator, Scott M. Heffernan, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation, and to enter an *Page 5 
order granting said compensation. In the alternative, relator requests that the writ order the commission to vacate its order denying him R.C.4123.56 wage loss compensation, and to enter an order granting said compensation. Findings of Fact:
 {¶ 7} 1. On October 25, 2002, relator sustained an industrial injury while employed as a professional hockey player for respondent Melrose Capital LLC ("employer"), dba Dayton Hockey Club, aka Dayton Bombers. The employer is a state-fund employer. On that date, relator was struck on the head by a hockey stick while playing in a hockey game. The employer certified the claim, which was initially allowed for "concussion" and was assigned claim number 02-459085.
 {¶ 8} 2. Earlier, in June 2002, relator had signed a three-year contract with COLHOC Limited Partnership, dba Columbus Blue Jackets. The Columbus Blue Jackets ("Blue Jackets") are a National Hockey League team.
 {¶ 9} 3. The Blue Jackets assigned relator to play the 2002/2003 hockey season with the Dayton Bombers, a minor league team that plays in the East Coast Hockey League. Relator was playing professional hockey in Dayton, Ohio, when the injury occurred.
 {¶ 10} 4. Under the terms of his contract, the Blue Jackets were obligated to pay relator a salary in consecutive semi-monthly installments with the commencement of the regular hockey season and continuing to each seasons end.
 {¶ 11} 5. The 2002/2003 hockey season ran from early October 2002 to the end of March 2003. The 2003/2004 and 2004/2005 hockey seasons ran from early October *Page 6 
to early April. Thus, the hockey seasons ran for approximately six months followed by a six-month off-season.
 {¶ 12} 6. On October 29, 2002, four days after his injury, relator was examined by James Tytko, M.D., at the Kettering Sports Medicine Center in Kettering, Ohio. Dr. Tytko wrote:
 * * * The patient is a Dayton Bomber who comes in with a chief complaint of a concussion. On 10-24 [sic] he was playing hockey and he took a high stick to the right side of his jaw and went down on the ice. He had immediate headache, dizziness, confusion, and some slight amnesia. Jason was present at the game and he examined him. He did not have any loss of consciousness. He was taken off the ice. He was somewhat ataxic and had persistent headache and was observed on the sidelines in the bench for quite some time. His symptoms gradually cleared, although they did not completely resolve. He has had 2 concussions previously. One was in 1988 and one in 1999. He has had no permanent residual effects of these two concussions. He has been asymptomatic since his last one. Today which is four days after the concussion, he is feeling significantly better. Each day is better, although he still wakes up with a slight headache and he was kind of foggy in the head for the first few days. Cognitively, he seems to be fine. Jason gave him the standard assessment, a concussion initially and he didn't do as well as in the preseason. He is going to readminister that in the future.
 * * *
 His symptoms of confusion and dizziness lasted greater than 15 minutes, but less than 1 hour, so; therefore, according to the Academy of Neurology, he had a grade 2 concussion. We talked about the potential nature of this, the potential ongoing symptoms.
 PLAN: He is going to stay out of hockey this week. Following next week, which will be 10-14 days following his concussion, he is going to start exerting himself under the guidance of Jason. If he can exert himself without a recurrence of his symptoms and he is completely asymptomatic, then he can return to hitting. * * * *Page 7 
 {¶ 13} 7. On November 8, 2002, Dr. Tytko wrote:
 * * * Because of his persistence of his headaches, we went ahead and did an MRI of his brain. The MRI of his brain is essentially normal, except he has just a borderline chiari 1 type malformation of the base of the brain. I called the radiologist and he said it just barely fits the criteria of a chiari malformation and there doesn't seem to be any tightness in the foramen magnum, but he feels that he has it. Because of this situation and the history of concussions and the fact that he is in a very demanding sport, we are going to send him to Dr. Poelstra, a neurosurgeon to get further clearance. I talked to Jason and he understands and since he is still having concussive symptoms, I think he shouldn't participate at this point.
 {¶ 14} 8. On November 19, 2002, at the Blue Jackets' request, relator was examined by R.A. Bornstein, Ph.D., at The Ohio State University, Department of Psychiatry. Dr. Bornstein wrote:
 Scott Heffernan was seen today for a neuropsychological evaluation in relation to his most recent concussion which occurred approximately three and one-half weeks ago. As you know, he has had persistent intermittent headache and did initially have some problems with dizziness, ringing in his ears, mental slowing and cloudiness. Those symptoms resolved within the first several days, and he has had some problems with decreased energy level and sleep difficulty related to his headache and frustration with being unable to return to competition. He does have some continued episodes of mental cloudiness, but his primary symptom is headache. The headache is not specifically localized, but he does have headache at some point during every day[.] On the neuropsychological evaluation today, he is at or above baseline. He has no other neurobehavioral symptoms, and there is no indication of subtle neurocognitive changes.
 This is his third concussion since 1998. The initial concussion was significant associated with a loss of consciousness and restriction from playing for several weeks. His second concussion occurred in December 2000, which was not associated with loss of consciousness[.] He was out of competition for a few days[.] With all of his concussions, headache has been the most prominent and persistent *Page 8 
symptom. As you recall, we reviewed his neuropsychological findings with him, and advised that the accumulated affect of these concussions is the likely basis for the protracted recovery. I did speak with Jason Franklin who indicated that they will be consulting with the team physician and reviewing his headache medications.
 {¶ 15} 9. On December 16, 2002, at the Blue Jackets' request, relator was examined by neurologist Geoffrey A. Eubank, M.D., who wrote:
 Scott Heffernon has some residual headaches after a grade II concussion. Typically, after a mild concussion, individuals can return to activity, once they are symptom free for a week or so. This has to be with both rest and exertion and he was almost there but, when he tried to exert himself, he did redevelop the headache, indicating that he is not quite ready to go back to full contact. I think he can intermittently re-challenge himself with exertion until he gets to the point where he is able to return. The fact that he has a prior history of what sounds like migrainous headaches probably makes him a little bit more likely to develop post-concussive headaches.
 {¶ 16} 10. On January 14, 2003, relator was again examined by Dr. Eubank who wrote:
 Scott Heffernan has had some recurrent headaches, most of them mild with an occasional bad headache. There are no other ongoing neurologic symptoms. His neurological exam is grossly unchanged.
 Scott Heffernan has some persistent headaches. At this point, in the absence of other neurologic symptoms, we may simply just be dealing with post-traumatic headaches, rather than a true postconcussive syndrome. I think we can be a little bit more liberal, at this point. Certainly, if exertion leads to debilitating headaches or significant neurologic symptoms, we will have to back off and come up with a different plan. If he is able to return to activity without significant headaches or other neurologic symptoms, then I think we are at a safer point now. Some patients simply develop chronic headaches following trauma and they would not necessarily be defined as a postconcussive syndrome. * * * *Page 9 
 * * * I think I would continue to embark on a trial of increasing physical activity until the dizziness resolves. He would need to be kept free from contact, until he is able to do these activities without significant neurologic symptoms. I think we can tolerate some mild headaches. * * *
 {¶ 17} 11. On January 23, 2003, at the Blue Jackets' request, relator was examined in Montreal, Canada, by neurosurgeon Karen M. Johnston, M.D., Ph.D., at the McGill University Health Care Centre. Dr. Johnston wrote:
 It is my impression that Scott sustained a significant concussion in October of 2002 and remains symptomatic from that injury at this point in time. Optimistically[,] he has had stretches when his symptoms have been much improved although they do not seem to have been entirely gone for any prolonged length of time. As a consequence[,] his attempts at high levels of exertion with symptoms have exacerbated his symptoms and it is now those persistent symptoms with which we are dealing. His presentation is quite classic in this way both in the presentation and types of symptoms he initially had and in the finding that they return with exertion. The best approach in my opinion at this time is to have Scott rest for a prolonged length of time to become entirely asymptomatic prior to any efforts to rehab him. Once he is asymptomatic for that period of time, we can begin to rehab him with gradual increases in exertion using a structured hockey rehab protocol. I am happy to help with this as we go through it and apparently in Ottawa his personal trainer (Barry Brennan) will be available to help supervise that rehab. * * *
 {¶ 18} 12. On February 5, 2003, Dr. Johnston wrote:
 * * * I now have the results from the neuropsyche investigation performed for Scott while he was here in Montreal. As described[,] Scott was still complaining of post-concussion symptoms including headache and sensitivity to light and noise. Specifically[,] his neuropsychological evaluation revealed problems recogni[z]ing after delay which of 2 objects of the same category was presented to him. Also in a double forced choice paradigm[,] his recall of object location was abnormal and the time taken to produce correct answers was significantly longer than that of control subjects. His results on the CogSport battery are pending. His *Page 10 
performances on verbal and visual working memory tasks sensitive to frontal lobe function were very good. Tests of motor functions of the hands were all in the normal range as were results on tests of attention. Therefore[,] there were mild abnormalities on neuropsyche testing consistent with his concussion symptoms and a follow-up assessment is recommended by my neuropsychologist once symptoms have resolved completely[.]
 {¶ 19} 13. On June 3, 2003, Dr. Johnston wrote:
 I have seen Scott in Montreal today in follow-up since his previous concussion evaluation[.] As you know Scott is doing well symptomatically and we have started his concussion rehab program[.] That was going fairly well for a couple of weeks and as he proceeded he had a minor setback over the weekend with mild symptoms of dizziness and "not feeling sharp" returning after pushing it a little on the stationary bike the day before. He feels better since that with a couple of days rest and once he is asymptomatic again we will resume his rehab at one step below that which he was doing[.] He has been riding for approximately 20 minutes with a heart rate of about 100 and so we will restart at about 15 minutes[.] He seems much improved over my initial meeting with him and is brighter and more cheerful[.] Scott is doing well in terms of recovery although points out that he is well aware he has lost a lot of fitness throughout this[.] First we will rehab his concussion and then fitness issues can come next and the timeline for this is a bit difficult to say[.] We are making progress however and it would be worthwhile to bring him back to see me and be re-evaluated once more prior to return to play[.] That will best be done when he is entirely asymptomatic and so we can arrange that for later on this summer[.]
 * * *
 {¶ 20} 14. On January 19, 2004, Dr. Johnston completed form C-84 on which she certified a period of TTD beginning with the date of injury, i.e., October 25, 2002 and continuing to "present."
 {¶ 21} The C-84 form poses the following query to the physician of record: *Page 11 
 Has the work related injury(s) or disease reached a treatment plateau at which no fundamental functional or physiological change can be expected despite continuing medical or rehabilitative intervention? (Maximum Medical Improvement)
 {¶ 22} In response to the above query, Dr. Johnston placed a checkmark in the "No" box. She also wrote: "Still undergoing gradual exertional concussion rehabilitation."
 {¶ 23} 15. On April 12, 2004, at the Blue Jackets' request, relator was again examined by Dr. Eubank who wrote:
 He has seen a neurosurgeon at a concussion clinic in McGill (Montreal, Canada). She (appropriately) voiced concerns that he was still symptomatic, almost a year out from his injury (now a year and a half out).
 * * *
 At this point, Scott Heffernan seems to have a more-persistent post-concussive syndrome. It is possible with time that his symptoms could gradually subside but, at the pace we are looking at, it is probably going to be at least six to twelve months, if this does not prove to be a permanent problem. Even if he were to have a full recovery, in all likelihood, it would not take very much for him to have another concussion. The nature of his sport will be that he almost certainly will have jarring injuries to his head and I think even minor jarring injuries are going to be much more apt to cause a concussion in him and whatever symptoms he does get are likely to be even more pronounced symptomatically and have a longer duration.
 Unfortunately, Scott Heffernan is not progressing as hoped and it is looking like he may have to seriously consider retiring from hockey. He is in the process of gathering several opinions now to decide what to do and I suppose there is a small possibility that he could end up being asymptomatic from this but, given the fact that possibility is fairly small and the fact that he will be continuing at a higher risk for future concussions, with more-long-lasting problems, *Page 12 
indicates that it would be best for him to pursue something else, where he is not a significant risk for concussion. * * *
 {¶ 24} 16. On April 15, 2004, the Blue Jackets' team physician, Joseph J. Ruane, D.O., wrote:
 As you are aware, I had the pleasure of revisiting Scott Heffernon on April 12, 2004. Scott continues in his post concussive rehabilitation efforts, but unfortunately admits to symptoms with exertional efforts such as treadmill. He describes being "foggy and not right" after about 15 minutes of aerobic activity. This can persist anywhere from several minutes to a day or so. The next day, he is generally normal. He gets mild exertional headaches as well.
 * * *
 Prior to my visit, Scott had a consultation with Dr. Eubank, a neurologist here in Columbus. I have also reviewed all the notes from Dr. Karen Johnston who is an expert consultant for the NHL and concussion management. In addition, I spoke to Bob Borenstein, Ph.D., who is the neuro-physiologist who is involved in Scott's case. There is a consensus among all clinicians that even if Scott's exertional symptoms cleared in the next month or so, it would be sometime before we are comfortable with him returning to contact. Should that happen, he is at extremely high risk for another injury, which could induce a prolonged post concussive syndrome of uncertain duration or severity. Given this athlete's young age and academic potential, we fear we may put his future at risk. The available literature indicates it is extremely rare for athletes with post concussive symptoms to return to contact sport. We do not feel justified in attempting to set a president [sic] here, and it is our consensus medical recommendations that Scott Heffernon retire from professional hockey.
 {¶ 25} 17. On July 28, 2004, Dr. Johnston completed another C-84. On this C-84, Dr. Johnston again certified TTD beginning October 25, 2002, the date of injury and to continue. Dr. Johnston indicated that relator was able to return to alternative work but not to his former position of employment as a professional hockey player. On the form, Dr. *Page 13 
Johnston failed to check a box in response to the query as to whether the injury was at maximum medical improvement ("MMI"). However, Dr. Johnston wrote: "Even if continued resolution of problems should not risk repeat injury after such a prolonged course."
 {¶ 26} 18. On August 25, 2004, Dr. Johnston completed a third C-84. Dr. Johnston again certified TTD beginning October 25, 2002. She indicated that relator was able to perform "light activity, no hockey." She also wrote: "No return to pro-fessional hockey."
 {¶ 27} In response to the query as to whether the injury is at MMI, Dr. Johnston checkmarked the "No" box. She then wrote: "Continues to have recurrence of symptoms with exertional activity."
 {¶ 28} 19. Earlier, during July 2004, relator moved for TTD compensation to be paid during the hockey off-seasons that began at the end of March 2003 and at the start of April 2004.
 {¶ 29} 20. In December 2004, relator also moved that the claim be additionally allowed for "post concussion symptoms."
 {¶ 30} 21. Following a January 19, 2005 hearing, a district hearing officer ("DHO") issued an order setting the full weekly wage ("FWW") at $1,875 and the average weekly wage ("AWW") at $1,784.49. In setting AWW, the DHO found "[i]njured worker was a student and amateur hockey player with no earnings prior to signing with the Dayton Hockey Club."
 {¶ 31} The DHO denied TTD compensation explaining: *Page 14 
 Injured worker's request for temporary total disability compensation for the periods from 04/16/2003 [sic] to 10/14/2003, 04/16/2004 to 10/17/2004 is denied. The District Hearing Officer finds per the 04/15/2004 report of Dr. Johnston that injured worker's condition has become permanent. The District Hearing Officer further finds that injured worker has been paid pursuant to his contract his entire wage for the hockey [sic] 2003 and 2004 hockey season[s]. The District Hearing Officer finds injured worker has not lost any wages as a result of the industrial injury and for that reason is also not entitled to temporary total disability compensation.
 {¶ 32} The DHO did not address the merits of the motion for an additional claim allowance but, instead, remanded the claim file to the Ohio Bureau of Workers' Compensation ("bureau") for review.
 {¶ 33} 22. Relator administratively appealed the DHO's order of January 19, 2005.
 {¶ 34} 23. Following a March 1, 2005 hearing, a staff hearing officer ("SHO") issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 01/19/2005, is modified to the following extent:
 Therefore, the C86, filed 12-2-04, is denied in part and granted in part.
 The Staff Hearing Officer has no jurisdiction to hear the issue of the additional allowance requested as the District Hearing Officer did not address said issue as she remanded said issue back for the BWC to address same.
 Wages remain as previously set in the District Hearing Officer order of 1-19-05. The average weekly wage is set at $1,784.49, per week and full weekly wage set at $1,875.00, per week. The Staff Hearing Officer denies the request for temporary total disability compensation from 4-16-03 [sic]-10-14-03 and from 4-16-04 — 10-17-04 as the medical evidence in support of same, is insufficient and the C84s from Dr. Johns[t]on are from 2004 only, are all incomplete and indicate, by 7-28-04, a permanent restriction from ever returning to his former position of employment. *Page 15 
 {¶ 35} 24. On April 1, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of March 1, 2005.
 {¶ 36} 25. On October 10, 2005, a medical file review was performed by S.R. Dange, M.D., at the bureau's request. Dr. Dange opined: "In my medical opinion, the medical evidence in this file supports the requested diagnosis of post concussion syndrome to be causally related to the injury of this claim. Allowance for the same under this claim is therefore justified."
 {¶ 37} 26. On October 14, 2005, the bureau issued an order additionally allowing the claim for "post concussion syndrome" based upon Dr. Dange's report.
 {¶ 38} 27. As early as May 3, 2005, relator completed a C-140 application for wage loss compensation. On this form, relator wrote: "Protective Claim." Relator completed three additional C-140 applications — all dated September 21, 2005. On at least two of the C-140 applications dated September 21, 2005, relator indicated that he was claiming both working and nonworking wage loss compensation.
 {¶ 39} 28. Following a November 23, 2005 hearing, a DHO issued an order denying the applications for wage loss compensation. The DHO's order explains:
 The injured worker was a professional hockey player. He signed a three year contract with the Columbus Blue Jackets in the Summer of 2002. On 10/25/2002, he sustained a work related injury which resulted in this claim. This claim is allowed for a CONCUSSION AND POST CONCUSSION SYNDROME. Because of this injury and the injured worker's previous concussions from playing hockey, the injured worker was eventually advised never to return to playing professional hockey. The Columbus Blue Jackets paid the injured worker for three years under the terms of his three year contract with the club.
 According to the C-140s now in the state file, the injured worker is alleging a combination of non-working wage loss *Page 16 
and working wage loss from 10/11/2002 to date. The injured worker is alleging working wage loss for the periods from 10/11/2002 through 03/30/2003, non-working wage loss from 03/31/2003 through 10/18/2003, working wage loss from 10/19/2003 through 04/03/2004, non-working wage loss from 04/04/2004 through 10/20/2004, working wage loss from 10/21/2004 through 04/09/2005, and non-working wage loss from 04/10/2005 to date.
 The injured worker's request for working wage loss for the periods from 10/11/2002 through 03/30/2003, 10/19/2003 through 04/03/2004, and 10/21/2004 through 04/09/2005 is denied. There is no evidence in the state file that the injured worker suffered a wage loss during these periods. As previously indicated, the Columbus Blue Jackets paid the injured worker the full rate of his contract for the three years, therefore, there is no wage loss for these periods.
 Non-working wage loss from 03/31/2003 through 10/18/2003 and from 04/04/2004 through 10/20/2004 is also denied. This is based on the fact that there is absolutely no job search records in the state file evidencing a good faith job search during either of these periods. The injured worker's attorney's contention that a good faith job search was not necessary during these periods because the injured worker was unaware that he was eligible for this type of compensation is wholly without merit. Ohio Administrative Code Section 4125-01-1 clearly indicates the requirements for non-working wage loss. There are no exceptions to these requirements under the Administrative Code. The District Hearing Officer could find no Ohio case law which made an exception under similar circumstances and, indeed, none was provided by the injured worker's attorney. The injured worker's attorney's assertion that R.C. 4123.95, which dictates that statutes be liberally interpreted in favor of the injured worker, is wholly without merit in this situation because the Ohio Administrative Code Section 4125-01-1 speaks plainly on its face. There is no room for interpretation under this Ohio Administrative Code Section.
 Non-working wage loss from 04/10/2005 to 11/23/2005 is also denied. There is insufficient evidence in the state file to indicate that the injured worker has conducted a good faith job search during this 7 1/2 month period. At hearing, the inured worker's attorney submitted job search records in this case for the first time. These records are voluminous, but *Page 17 
each record is incomplete in one way or another. None of the records have a date of contact listed on them. It is impossible to ascertain when the injured worker contacted which alleged employer. The injured worker was not present at hearing to clarify this matter. Some of the contacts lack a contact person; others lack a job title or an employer's phone number; and some lack the employer's street address, the employer's response, and do not mention any follow-up. It does not appear from any of these records that the injured worker has had even one job interview in the last 7 1/2 months. Further, it is impossible to ascertain whether or not these job search records were actually made by the injured worker himself. There are two distinct handwritings on each and every job search contact sheet. On the top of each sheet the injured worker's name and claim number is neatly printed in a different style of ink. The alleged job contacts appear to be in a different ink and different handwriting. The injured worker was not present at hearing to explain any of these limitations and problems. For these reasons, the District Hearing Officer finds that the injured worker did not make a good faith job search during this period and non-working wage loss from 04/10/2005 through 11/23/2005 is denied.
(Emphasis sic.)
 {¶ 40} 29. Relator administratively appealed the DHO's order of November 23, 2005. Following a January 12, 2006 hearing, an SHO issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 11/23/2005, is modified to the following extent. Therefore, the C-140's, filed 05/03/2005 and 09/23/2005, are denied.
 A good faith effort to find alternative comporting work has not been made herein.
 Staff Hearing Officer notes that, there are no records of completed job search contacts provided to date, with regard to the periods of time of wage loss at issue today.
 The injured worker was a professional hockey player. He signed a three year contract with the Columbus Blue Jackets in the Summer of 2002. On 10/25/2002, he sustained a work related injury which resulted in this claim. This claim is *Page 18 
allowed for a CONCUSSION AND POST CONCUSSION SYNDROME. Because of this injury and the injured worker's previous concussions from playing hockey, the injured worker was eventually advised never to return to playing professional hockey. The Columbus Blue Jackets paid the injured worker for three years under the terms of his three year contract with the club.
 According to the C-140s now in the state file, the injured worker is alleging a combination of non-working wage loss and working wage loss from 10/11/2002 to date. The injured worker is alleging working wage loss for the periods from 10/11/2002 through 03/30/2003, non-working wage loss from 03/31/2003 through 10/18/2003, working wage loss from 10/19/2003 through 04/03/2004, non-working wage loss from 04/04/2004 through 10/20/2004, working wage loss from 10/21/2004 through 04/09/2005, and non-working wage loss from 04/10/2005 to 11/23/2005.
 The injured worker's request for working wage loss for the periods from 10/11/2002 through 03/30/2003, 10/19/2003 through 04/03/2004, and 10/21/2004 through 04/09/2005 is denied. There is no evidence in the state file that the injured worker suffered a wage loss during these periods. As previously indicated, the Columbus Blue Jackets paid the injured worker the full rate of his contract for the three years, therefore, there is no wage loss for these periods.
 Non-working wage loss from 03/31/2003 through 10/18/2003 and from 04/04/2004 through 10/20/2004 is denied. There is no evidence in the file of a job search performed, during said periods of time, as required in Ohio Administrative Code Section 4125-01-1.
 Non-working wage loss from 04/10/2005 through 11/23/2005 is denied. Evidence of a good faith job search being conducted during this period of time has not been presented. Job search records filed are incomplete and do not support the contention that a good faith effort has been made by the claimant to find comporting employment.
 The balance of the order of the District Hearing Officer, dated 11/23/2005, is affirmed in its entirety and incorporated herein, as if fully rewritten.
(Emphasis sic.) *Page 19 
 {¶ 41} 30. On February 2, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of January 12, 2006.
 {¶ 42} 31. On November 8, 2006, relator, Scott M. Heffernan, filed this mandamus action.
Conclusions of Law: {¶ 43} Three issues are presented: (1) whether relator can show eligibility for TTD compensation during the hockey off-seasons; (2) whether the commission abused its discretion in determining that the industrial injury has become permanent and that the medical evidence itself is insufficient to support TTD compensation; and (3) whether the commission abused its discretion in denying wage loss compensation.
 {¶ 44} The magistrate finds: (1) relator cannot show eligibility for TTD compensation during the hockey off-seasons; (2) the commission did abuse its discretion in determining that the industrial injury has become permanent and that the medical evidence itself is insufficient to support TTD compensation; and (3) the commission did not abuse its discretion in denying wage loss compensation.
 {¶ 45} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order to the extent that it determines that the industrial injury has become permanent and that the medical evidence itself is insufficient to support TTD compensation.
 {¶ 46} State ex rel. Crim v. Ohio Bur. of Workers' Comp. (2001),92 Ohio St.3d 481, is dispositive of the TTD eligibility issue.
 {¶ 47} Susan Y. Crim was employed as a swimming teacher during the 1996-1997 school year by the Tuscarawas County Board of Mental Retardation and Developmental *Page 20 
Disabilities ("MRDD"). Pursuant to the terms of her employment contract with MRDD, Crim worked from August 1996 through June 5, 1997. Crim was not required to report to work during summer break. Rather than being paid over a nine-month period that corresponded to the school year, Crim elected to be paid over a prorated 12-month period. Thus, Crim received compensation from MRDD during the summer months for work actually performed during the academic calendar year.
 {¶ 48} On May 29, 1997, Crim was injured in the course of her employment with MRDD and a workers' compensation claim was allowed. Crim was paid TTD compensation for a period of time covering the summer break, June 7 to August 1997. Crim had intended to work during the summer at the Tuscarawas County YMCA, as she had worked there the previous summer. She was unable to perform her summer job during her period of disability. Later, the commission vacated Crim's TTD award on grounds that she was not entitled to TTD compensation because she could not establish a loss of earnings since she received prorated earnings during the summer months. The commission ordered the overpayment to be recovered. Thereafter, Crim filed a complaint in this court claiming that the commission had abused its discretion when it vacated the TTD award.
 {¶ 49} This court, in Crim, ordered the commission to vacate its overpayment recovery order. This court's decision was appealed to the Supreme Court of Ohio.
 {¶ 50} In Crim, the Supreme Court of Ohio addressed two issues:
 * * * The first issue is whether a teacher who contracts to teach during a school year is considered to have voluntarily abandoned her or his employment at the end of an academic calendar year for the purposes of temporary total disability compensation. The second issue is whether a teacher who *Page 21 
is employed for nine months of the year and elects to receive prorated compensation over twelve months is entitled to temporary total disability compensation for summer employment that she or he is unable to perform because of the allowed conditions of a claim.
Id. at 482.
 {¶ 51} The court's disposition of the first issue is instructive here:
 We find that a teacher does not voluntarily abandon her or his position at the end of a school year and that, although receiving prorated earnings, she or he is entitled to temporary total disability compensation as a result of the allowed conditions of her or his workers' compensation claim.
 R.C. 4123.56 provides compensation for workers who suffer injuries that result in temporary total disability. "[T]emporary total disability is defined as a disability which prevents a worker from returning to [her or] his former position of employment." State ex rel. Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630, 23 O.O.3d 518, 433 N.E.2d 586, syllabus. Where an employee's own actions, for reasons unrelated to the injury, preclude her or him from returning to her or his former position of employment, she or he is not entitled to temporary total disability benefits, since it is the employee's own action rather than the injury that precludes return to the former position. State ex rel. Jones Laughlin Steel Corp. v. Indus. Comm. (1985), 29 Ohio App.3d 145, 147, 29 OBR 162, 164, 504 N.E.2d 451, 454. See, also, State ex rel. Baker v. Indus. Comm. (2000), 89 Ohio St.3d 376, 732 N.E.2d 355. When determining whether an injury qualifies for temporary total disability compensation, the court utilizes a two-part test. "The first part of this test focuses on the disabling aspects of the injury, whereas the latter part determines if there are any factors, other than the injury, which would prevent the claimant from returning to [her or] his former position." State ex rel. Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42, 44, 517 N.E.2d 533, 535. However, only a voluntary abandonment will preclude the payment of temporary total disability. State ex rel. Rockwell Internatl. v. Indus. Comm. (1988), 40 Ohio St.3d 44, 46, 531 N.E.2d 678, 680.
 Appellee satisfies the first part of the Ashcraft test, since there is no dispute as to the disabling aspects of her injury. *Page 22 
 However, appellants contend that appellee voluntarily terminated (abandoned) her employment at the end of the school year by virtue of the terms of her employment contract, thus failing the second part of the Ashcraft test. Accordingly, the issue is narrowed to whether appellee's employment contract, which terminated her employment at the end of the school year, was a voluntary act by appellee that prevented her from returning to MRDD.
 "[T]he mere fact that [a claimant was] hired for a specific term of employment does not, standing alone, preclude the receipt of temporary total disability benefits for any period beyond the length of that term." State ex rel. Pittsburgh Plate Glass Industries, Inc. v. Indus. Comm. (1991), 71 Ohio App.3d 430, 433, 594 N.E.2d 80, 82. It is the claimant's intent that determines whether the termination of employment is unrelated to the allowed condition so as to preclude return to former employment. Id. at 434, 594 N.E.2d at 82. We recognize that an employee/employer agreement for a specific term may be evidence of that employee's intent to voluntarily terminate employment. Id. However, the facts of this case and the intention of appellee do not support such a conclusion.
 The facts in the cases in which we have found a voluntarily abandonment differ significantly from the facts in the case at bar. See, e.g., State ex rel. McGraw v. Indus. Comm. (1990), 56 Ohio St.3d 137, 564 N.E.2d 695 (claimant quit his job); State ex rel. Smith v. Indus. Comm. (1990), 50 Ohio St.3d 45, 553 N.E.2d 247 (claimant chose to voluntarily retire); State ex rel. Cobb v. Indus. Comm. (2000), 88 Ohio St.3d 54, 723 N.E.2d 573
(claimant was fired due to a violation of a known workplace policy). There is no evidence that appellee intended to permanently leave her position of employment as a teacher with MRDD. Rather, the evidence before the court shows that appellee sought to work only for the duration of her summer vacation, as she had done the previous year, and then return to her teaching position in the fall. As such, we find that appellee did not abandon her position with MRDD at the end of the 1996-1997 academic year.
 In addition, it is axiomatic that a teacher who is required to leave her teaching position at the end of a school year does not do so voluntarily. If we were to conclude that teachers "voluntarily abandon" their positions of employment at the *Page 23 
conclusion of each school year, we would disqualify an entire class of claimants simply because of the unique terms of their employment. We decline to reach such an unreasonable conclusion. Based upon the foregoing, we find that there are no factors present that, independent of the injury, prevented appellee from returning to her former position with MRDD. Accordingly, appellee satisfies the second part of the Ashcraft test. We hold that appellee is entitled to receive temporary total disability compensation over the summer break as the result of the allowed conditions of her claim.
Id. at 483-484. (Emphasis sic.)
 {¶ 52} Thus, under Crim, relator had the burden of proving that he had intended to work during the hockey off-seasons in order to show his eligibility for TTD compensation during the hockey off-seasons.
 {¶ 53} The record fails to show that relator produced any evidence, including his own testimony, that he had intended to work during the hockey off-seasons.
 {¶ 54} In fact, the evidence relating to this matter strongly suggests otherwise. For example, in determining relator's AWW, the DHO's order of January 19, 2005, states: "Injured worker was a student and amateur hockey player with no earnings prior to signing with the Dayton Hockey Club."
 {¶ 55} In a memorandum of law submitted by relator's counsel for consideration at the January 19, 2005 hearing on the issue of the calculation of AWW, relator argued that approximately 264 days of unemployment (during the year prior to the date of injury) should be excluded from the AWW calculation. According to the memorandum, relator "has to train year-round to stay in tip-top shape for the physical aspects of the game and to retain his employment." *Page 24 
 {¶ 56} While it is certainly conceivable that a professional hockey player might seek other employment during the hockey off-season, the problem here is that relator presented no evidence that he intended to obtain employment during the hockey offseasons.
 {¶ 57} As the commission puts it here, relator is essentially claiming "hypothetical lost wages based on a missed opportunity for a second job during the off-season." As the commission notes here, "Heffernan has not even asserted what type of a second job his industrial injury prevented him from performing." (Commission's brief at 7.)
 {¶ 58} Given the above analysis, it is understandable that the DHO's order of January 19, 2005, would find that relator "has not lost any wages as a result of the industrial injury and for that reason is also not entitled to temporary total disability compensation." While it can perhaps be argued that the DHO's finding is conclusory or lacking in specificity, again, there is no evidence in the record upon which a different finding could be premised.
 {¶ 59} Accordingly, the magistrate concludes that the commission correctly determined that relator has failed to show that he lost any wages during the hockey offseasons due to his industrial injury.
 {¶ 60} Turning to the second issue, in Vulcan Materials Co. v. Indus.Comm. (1986), 25 Ohio St.3d 31, the Supreme Court of Ohio addressed one of the termination criteria for TTD compensation, stating:
 A second issue raised in these appeals brings into question whether, in the commission's consideration of the permanency of a disability, the commission must determine whether the claimant could return to his former position of employment. *Page 25 
 We hold that in the consideration of the permanency of a disability, the commission need not determine whether the claimant could return to his former position of employment. The commission's designation of a disability as permanent relates solely to the perceived longevity of the condition at issue. It has absolutely no bearing upon the claimant's ability to perform the tasks involved in his former position of employment. Further, in Logsdon v. Indus. Comm. (1944), 143 Ohio St. 508 * * *, at paragraph two of the syllabus, this court defined the term "permanent" as applied to disability under the workmen's compensation law as a condition which will, "* * * with reasonable probability, continue for an indefinite period of time without any present indication of recovery therefrom."
Id. at 33.
 {¶ 61} Effective August 22, 1986, R.C. 4123.56(A) provides that payment of TTD compensation shall not be made "when the employee has reached maximum medical improvement."
 {¶ 62} Supplementing the statutory change, Ohio Adm. Code 4121-3-32
states:
 (A) The following provisions shall apply to all claims where the date of injury or the date of disability in occupational disease claims accrued on or after August 22, 1986. The following definitions shall be applicable to this rule:
 (1) "Maximum medical improvement" is a treatment plateau (static or well-stabilized) at which no fundamental functional or physiological change can be expected within reasonable medical probability in spite of continuing medical or rehabilitative procedures. An injured worker may need supportive treatment to maintain this level of function.
 {¶ 63} Four years after Vulcan Materials, this court, in State ex rel.Matlack, Inc. v. Indus. Comm. (1991), 73 Ohio App.3d 648, equated the permanency concept of Vulcan Materials with the concept of MMI. This court, in Matlack, stated: *Page 26 
 In State ex rel. Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630 * * *, the Supreme Court of Ohio held that an employee may receive temporary total disability compensation until: (1) the employee has returned to work; (2) the employee's treating physician states that the employee is capable of returning to the employee's former position of employment; and (3) the temporary disability has become permanent. Accord State ex rel. Eaton Corp. v. Lancaster (1988), 40 Ohio St.3d 404[.] * * *
 The concept of permanency relates to the perceived longevity of the condition. Vulcan Materials Co. v. Indus. Comm. (1986), 25 Ohio St.3d 31[.] * * * A permanent condition is one which will, with reasonable probability, continue for an indefinite period of time without any indication of recovery therefrom. Id. at 33 * * *, quoting Logsdon v. Indus. Comm. (1944), 143 Ohio St. 508[.] * * *
 Essentially, the Supreme Court of Ohio has adopted the ubiquitos maximum medical improvement ("MMI") test for purposes of temporary total disability compensation. As is the case in other states, temporary total benefits will be paid during the healing and treatment period for the condition until the claimant has reached some certain level of stabilization. See 2 Larson, The Law of Workmen's Compensation (1991), Sections 57.12(b) and (c). When this stabilization has been reached and no further improvement is probable, then the condition is permanent and claimant can seek compensation for types of permanent disability, namely, permanent partial disability compensation for partial impairment of earning capacity, and permanent total disability compensation for total impairment of earning capacity.
Id. at 654-655.
 {¶ 64} The DHO's order of January 19, 2005, "finds per the 4/15/2004 report of Dr. Johnston that injured worker's condition has become permanent."
 {¶ 65} As relator points out here, there is no report from Dr. Johnston dated April 15, 2004. However, there is a report from Dr. Ruane dated April 15, 2004, which *Page 27 
states: "[I]t is our consensus medical recommendations that Scott Heffernon retire from professional hockey."
 {¶ 66} To the extent that the "consensus medical recommendations" can be viewed as Dr. Ruane's opinion that relator is permanently unable to return to his former position of employment as a professional hockey player, under Vulcan Materials, such opinion does not constitute evidence of permanency or of MMI.
 {¶ 67} Clearly, the DHO's permanency finding constitutes an abuse of discretion because the April 15, 2004 report from Dr. Ruane contains no evidence that the industrial injury has become permanent or has reached MMI.
 {¶ 68} As previously noted, the DHO's order of January 19, 2005 was said to be "modified" by the SHO's order of March 1, 2005. However, the SHO's order does not mention an April 15, 2004 report or attempt to correct the DHO order's identification of the April 15, 2004 report. Rather, the SHO attempts to add evidence in support of the permanency finding by citation to the July 28, 2004 C-84 from Dr. Johnston.
 {¶ 69} Clearly, Dr. Johnston's July 28, 2004 C-84 contains no evidence that the industrial injury is at MMI. As previously noted, in her C-84, Dr. Johnston failed to mark a response box to the preprinted MMI query. Also, Dr. Johnston wrote: "Even if continued resolution of problems should not risk repeat injury after such a prolonged course."
 {¶ 70} Perhaps the SHO viewed Dr. Johnston's written statement as an opinion that relator is permanently unable to return to his former position of employment as a professional hockey player and, on that basis, concluded that Dr. Johnston's C-84 is evidence of a "permanent restriction from ever returning to his former position of employment." If that was the SHO's analysis, it is legally flawed under VulcanMaterials. *Page 28 
Clearly, Dr. Johnston's C-84 dated July 28, 2004 contains no evidence that the industrial injury is permanent or at MMI.
 {¶ 71} In fact, there is no medical evidence in the record upon which the SHO could have premised a finding that the industrial injury has become permanent or is at MMI.
 {¶ 72} Although relator is not eligible for TTD compensation during the hockey offseasons, the commission's unsupported permanency finding can be prejudicial to any further claim of TTD compensation put forth by relator. Accordingly, the commission must be ordered to vacate its permanency finding.
 {¶ 73} The SHO's order of March 1, 2005 violates the requirement ofState ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, by declaring the medical evidence "insufficient" without an explanation for the insufficiency finding. Noll is also violated by declaring Dr. Johnston's C-84s to be "incomplete" without an explanation for such declaration. Moreover, that Dr. Johnston completed her first C-84 in 2004, i.e., January 19, 2004, some two months following her initial examination of relator, is not cause, by itself, for rejecting the C-84. In short, the commission's characterization of the medical evidence as being "insufficient" and/or "incomplete" constitutes an abuse of discretion.
 {¶ 74} The third issue is whether the commission abused its discretion in denying wage loss compensation. In the order of January 12, 2006, the SHO denies working wage loss compensation for the periods relator was paid his salary during the hockey seasons. The SHO found no evidence that relator suffered a wage loss during those periods because the Blue Jackets paid relator the full rate of his contract for those three *Page 29 
hockey seasons. Relator does not seriously challenge denial of wage loss compensation for the periods relator was receiving his full salary.
 {¶ 75} However, relator does challenge the denial of so-called nonworking wage loss compensation during the hockey off-seasons. The SHO denied wage loss compensation for those periods because relator failed to submit any job search records for those periods. According to relator, he should be excused from the job search requirement because he allegedly could not have known that he would need to start a job search as of March 31, 2003 (at the end of the 2002/2003 season), because he did not know until the SHO's hearing of March 1, 2005, that his request for TTD compensation would be denied.
 {¶ 76} There is absolutely no authority to support the proposition suggested by relator that the wage loss job search requirement can be excused if the claimant is awaiting a decision on a request for TTD compensation that corresponds to the same time frame. Relator cites to no authority to support his novel argument. The argument lacks merit.
 {¶ 77} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of March 1, 2005, to the extent that it denies TTD compensation on grounds that the industrial injury has become permanent or has reached MMI and to the extent that it finds the medical evidence itself to be insufficient and to enter an amended order that denies TTD compensation solely on grounds that relator was ineligible to receive said compensation during the hockey offseasons in the absence of evidence that he intended to obtain other employment.